# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

ANGELA COVEY

VERSUS

PHILLIP V. SEIFERT, ET AL.

CIVIL ACTION

NO. 18-99-JWD-EWD

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 12) filed by Defendants Phillip V. Seifert, Linda K. Seifert, and Allstate Insurance Company. Plaintiff Angela Covey opposes the motion. (Doc. 14.) Defendants have filed a reply. (Doc. 15.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendants' motion is denied.

## I. Relevant Factual Background

### A. The Parties, the Flood, and the Remediation

This is a personal injury action arising out of the Great Flood of 2016. Most of the facts are not disputed.

Specifically, in 2016, Defendants Linda and Phillip Seifert were owners of a residence located at 23439 Blood River Road, Springfield, Louisiana. (Defendant's *Statement of Undisputed Facts* ("*DSUF*") ¶ 1, Doc. 12-3; Plaintiff's *Response to Statement of Undisputed Fact* ("*PRSUF*") ¶ 1, Doc. 14-1.) That property was insured by Defendant Allstate. (*DSUF* ¶ 1, Doc. 12-3; *PRSUF* ¶ 1, Doc. 14-1.)

The Seiferts' property suffered severe flooding during August, 2016. (*DSUF* ¶ 2, Doc. 12-3; *PRSUF* ¶ 2, Doc. 14-1.)[1]  The parties agree that, at this time, "Phillip Seifert was eighty-two years old and in bad health[,]" and "Linda Seifert was a frail older lady[.]" (*DSUF* ¶ 3, Doc. 12-3; *PRSUF* ¶ 3, Doc. 14-1.)

As a result of the flood, the Seiferts' dwelling was uninhabitable, and its contents suffered severe damage. (*DSUF* ¶ 4, Doc. 12-3; *PRSUF* ¶ 4, Doc. 14-1.)  After their evaluation, the Seiferts resided in Osyka, Mississippi near family members for about six months until they moved into a FEMA trailer on their property. (*DSUF* ¶ 5, Doc. 12-3; *PRSUF* ¶ 5, Doc. 14-1.)

Linda Seifert hired her son Michael Weeks to help clean out the flooded house and barn, and it was agreed that his wife, Plaintiff Angela Covey, could assist him. (*DSUF* ¶ 6, Doc. 12-3; *PRSUF* ¶ 6, Doc. 14-1.)  The Seiferts agreed that Mr. Weeks and his wife Angela Covey would each receive $100 per day. (*DSUF* ¶ 6, Doc. 12-3; *PRSUF* ¶ 6, Doc. 14-1.)  Plaintiff emphasizes that Weeks earns well over $100 per day in his regular job. (Weeks Dep. 35: 5–15, Doc. 12-4.)

Weeks was asked at his deposition if Linda Seifert was "there at any time when [he was] doing [the cleanup]?", and he responded:

> Very, very rarely; they were there to deliver supplies and so forth and to bark at me a little bit and then – you know, because that's what moms do best, and she would sometimes deliver supplies, pay me back, reimburse me for supplies that I got, and she would go out and play with the – not play, but work in the garden and recover plants, trying to get her plants back, and she wouldn't not so much go in and work because she's, kind of, frail.

(Weeks Dep. 36: 14–24, Doc. 12-4.)

---

[1] Plaintiff highlights in briefing that the Seiferts were also subject to severe flooding in March 2016; at the time of the August 2016 flooding, Weeks was still performing repair work for the March 2016 flood. (Weeks Dep. 41:2–6, Doc. 14-3.).

### B. Plaintiff's Accident

The present suit arises out of an accident that Plaintiff alleges occurred while she was cleaning out a large shed (also called a barn or a shop) on Seiferts' "house." (*DSUF* ¶ 7, Doc. 12-3; *PRSUF* ¶ 7, Doc. 14-1; L. Seifert Dep. 10:21–23, Doc. 12-6.) Plaintiff reported that she slipped in the shed while pulling out tools and other contents of that building. (*DSUF* ¶ 8, Doc. 12-3; *PRSUF* ¶ 8, Doc. 14-1.)

Ms. Covey allegedly slipped and fell when she stepped into a pile of adult diapers in the shed that were saturated and broken from the flood. (*DSUF* ¶ 9, Doc. 12-3; *PRSUF* ¶ 9, Doc. 14-1.) When some of the diapers broke, silicone beads spread all over the shed. (*DSUF* ¶ 10, Doc. 12-3; *PRSUF* ¶ 10, Doc. 14-1.)

Ms. Covey testified that, when she stepped on the pile of wet diapers, her left foot slipped into a fake bomb that was a movie prop and her left foot suffered abrasions that later became infected. (*DSUF* ¶ 13, Doc. 12-3; *PRSUF* ¶ 16, Doc. 14-1.) Plaintiff did not seek treatment until about three or four days later when her left foot had become swollen from an infection. (*DSUF* ¶ 17, Doc. 12-3; *PRSUF* ¶ 17, Doc. 14-1.)

### C. Issues Surrounding the Accident

The central issue here is whether the condition was open and obvious and, related, whether the Seiferts were negligent. The Court will now break down the evidence upon which both sides rely.

#### 1. Defendant's Evidence

Defendants point to Plaintiff's own testimony; she reported that the pile of damaged diapers was "big," measuring five feet by five feet and about eighteen inches tall. (*DSUF* ¶ 11, Doc. 12-3; *PRSUF* ¶ 11, Doc. 14-1.) Additionally, when she was asked if the pile was "hidden

in any way," she responded, "It was right out in the open. I didn't see it. I didn't see it. . . . I didn't have my glasses on." (Pl. Dep. 52:24–53:3, Doc. 12-5.)

Defendants further highlight that Plaintiff had fallen twice before her main fall in the barn, one of which was "on a pile of Depends outside the barn to the right of a tree" in a hole full of garbage and debris. (Pl. Dep. 59:4–62:6., Doc. 12-5.) On this first occasion, which occurred three or four days before her fall in the barn, she had previously been in the shed removing debris during the daytime. (Pl. Dep. 61:25–62:14, Doc. 12-5.)

Defendants also rely on Weeks' testimony. Weeks stated that the "stuff [(silicone)] was everywhere, I mean, it was actually up – it's as high as – everything that you could grab all the way up above your head, this stuff stuck to, you know, so . . . if she would been climbing the walls, she would have slid off of it[.]" (Weeks Dep. 45:23–46:3, Doc. 12-4.) "[I]t was like a jelly everywhere. . . . [a] gelatinous substance" that was "coating everything[.] . . . [T]his is a layer . . . about a quarter-inch thick over everything in sight, and then it was as about . . . a big pile of it." (Weeks Dep. 47:18–48:5, Doc. 12-4.)

Defendants also point to Mrs. Seifert's testimony to support their motion. Mrs. Seifert said that the debris was "all over the place," and the "silicon stuff was everywhere." (L. Seifert Dep. 25:15–25, Doc. 12-6.) Linda Seifert also stated that the diapers "were in boxes, sealed, but the floods opened the boxes and . . . they were everywhere." (L. Seifert Dep. 11:17–21, Doc. 12-6.)

### 2. Plaintiff's Evidence

On the other hand, Plaintiff highlights different facts which demonstrate Defendants' negligence. For instance, unlike Mrs. Seifert, Weeks said the diapers had been opened before the flood, as opposed to being "closed up like they would be from the manufacturers, . . . like, to

have a seal around them." (Weeks Dep. 46:8–46:21, Doc. 12-4.) The diapers were "stuffed into boxes . . . and improperly stored . . ., and then they busted . . . and went everywhere[.]" (Weeks Dep. 46:22–48:5, Doc. 12-4.)

Plaintiff also emphasizes Linda Seifert's own testimony. Seifert stated that conditions in the shop were "very dangerous because of the wet on the floor, the water and slush that was there on the floor. Everything you touched, there was water coming out of it." (L. Seifert Dep. 35:18–21, Doc. 14-4.)

Even more so, Plaintiff focuses on Mrs. Seifert's own conduct in allegedly creating the condition. Linda Seifert tried to do "a little" of the cleanup work herself. (L. Seifert Dep. 10:3–12, Doc. 12-6.) Mrs. Seifert stated that she "took a shovel when [she] was there one day alone, and [she] took a shovel and shoveled it out as much as [she] could because [she] was afraid [her] husband would try and go back there with his walking cane." (L. Seifert Dep. 11:21–25, Doc. 12-6.) Mrs. Seifert was asked if she "tried to clean up some of that mess back there prior to [Plaintiff and Weeks] coming", and she responded: "there was so much debris in there . . . I made myself a walkway through there so I could check on the back items . . . in the back of the shop, but there was no way to get all of it." (L. Seifert Dep. 12:9–24, Doc. 12-6.)

Mrs. Seifert also testified that she did not tell her son about the condition of the floor. Specifically, she stated:

> Q: Now, did you tell them anything about there being this diaper, gelatinous, slippery substance on the floor before they went in?
>
> A: I believe I told my son, but I'm not quite sure. I mean there is no way for them to notice. I mean I had it - - some of it shoveled outside the door to the side. . . under the bushes, and I was very embarrassed that that had happened. . . . I didn't want my husband - - no, him anywhere near there, and I didn't want him to see it, what happened. . . . But - - and I tell you the truth, I - - (Witness shakes head.) - - I don't - - I don't remember

5

> telling him.  I really don't remember telling him.  I remember telling him
> to be very careful - -

(L. Seifert Dep. 14:1–24, Doc. 14-4.)  She later said:

> Q:    I just want to be clear about this - - this mess with the diapers.  You didn't
> mention anything at all to Angela about that particular problem, the silica - -
>
> A:    I know I didn't, because that's why I was back there with the shovel,
> because I was so embarrassed about that happening . . . and didn't want
> anybody to see that or have any questions about my mother, you know.

(L. Seifert Dep. 35:22–36:6, Doc. 14-4.)

### 3. Amount of Light in the Shed

Lastly, the parties disagree about the amount of light in the shed.  Defendants point to the

fact that the front doors of the shed were open at the time of the fall and that it was "late

afternoon . . . [b]etween 3:30 and four, five, maybe." (Weeks Dep. 44:24–45:6, Doc. 12-4.)

Defendant also highlights a photograph of the barn showing two windows on the side:



(Pl. Dep. 47, Ex. AC #1, Doc. 12-5.)

But Weeks later said of the Plaintiff's fall: "I mean, she wasn't right on that pile because you could - - I suppose, you could have seen the pile, maybe, but there no lights, so we weren't able to hook up any lights, so - - and it was dark in the afternoon, and their shop was in the shade, and the sun sets behind us." (Weeks Dep. 48:10–15, Doc. 12-4.)  According to Weeks, that was also the first time Weeks and Plaintiff had been in the shed after the flood. (Weeks Dep. 48:16–18, Doc. 12-4.)  Additionally, there was no electricity at the house during this time. (Pl. Dep. 62:18–21, Doc. 12-5.)

## II.    Relevant Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .   [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## III. Discussion

### A. Parties' Arguments

#### 1. Defendants' Memorandum in Support (Doc. 12-2)

Defendants begin by arguing that this action is controlled by negligence law, not the law on strict liability. Defendants urge that "courts have consistently held that such slippery substances are defects **ON** the premises, rather than **IN** the premises." (Doc. 12-2 at 4 (emphasis in original).)

Defendants next contend that the doctrine of force majeure applies because the "bloated and broken diapers in the shed resulted from natural forces in the form of unprecedented rainfall and flooding and with no connection to possible negligence by the Seiferts." (Doc. 12-2 at 5.) Defendants maintain that, under Louisiana Supreme Court law, they have no liability if the force is "a providential occurrence or extraordinary manifestation of the forces of nature, which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence and care." (Doc. 12-2 at 5.)

Defendants move on to say that they had no custody of the flooded property. Defendants assert that they "evacuated their property when the storm waters hit in August and . . . they resided in Osyka, Mississippi for about six months before returning to their property." (Doc. 12-2 at 5.) Defendants argue that Ms. Seifert's son testified that she only occasionally visited the property. Defendants analogize to strict liability, which says that the owner of a building under renovation does not have "custody" of the structure.

Defendants then argue that the danger was open and obvious. The pile of diapers was large—five feet by five feet and eighteen inches tall. Further, the injury happened in the

afternoon with the large doors open, and there were windows that offered more light.  On top of that, Plaintiff had been in the shed once before.  Plaintiff admitted that she was aware of the silicone beads from the broken diapers that had spread over the floor and that the pile was "big" and "right out in the open."  Thus, under Louisiana law, the Seiferts owed no duty to Plaintiff.

## 2. Plaintiff's Opposition

Plaintiff urges that Defendants' evidence shows, at best, comparative fault, not entitlement to summary judgment.  Plaintiff highlights that conditions in the shed were dangerous.  Plaintiff and her husband had planned to gut the shed, perform mold abatement, and rebuild it, and they were in the process of doing this when the accident happened.  Plaintiff's husband said there was no electricity and limited light in the shop, and the premises were contaminated.  Plaintiff also focuses on the fact that Defendant Mrs. Seifert acknowledged that she tried to clean the premises where the fall happened and was successful only in spreading the wet diapers and hiding it.  Mrs. Seifert was also not sure she told her son about the mess, and she said "there was NO way for them to notice." (Doc. 14 at 3 (emphasis added by Plaintiff) (quoting Ms. Seifert Dep. at 14).)  Ms. Seifert also stated that it "was very dangerous because of the water and slush that was there on the floor" and that the "silicon stuff was everywhere." (Doc. 14 at 3 (citations omitted)).  She also stated that she was "back there with the shovel because she was embarrassed and did NOT want anyone to have questions about her mother (whose diapers they were).  Plaintiff urges that this concealment, combined with not telling her son about the problem, creates some fault on her part.

Plaintiff also testified that she did not see the diapers.  While Defendants focus on the size of the pile, they ignore the lack of light and low visibility.  Her husband also said that the diapers were improperly stored.  Plaintiff says that mold, water, and debris were everywhere.

Plaintiff points to a few cases in which summary judgment was denied. In one, the court found summary judgment inappropriate where the owner-lessor's knowledge of the defect in premises was at issue. (Doc. 14 at 5 (citation omitted).) Plaintiff also argues that La. Civ. Code art. 2322 provides a basis for liability because there was a defect in the premises and a failure to act with reasonable care.

Lastly, Plaintiff argues that the activity in which she engaged was an ultrahazardous activity and thus could not be performed in a safe and workmanlike matter. Thus, Plaintiff should not have any comparative fault.

In closing, Plaintiff contends that Defendants have "extensive fault" from their "awareness of the very dangerous slippery condition and failure to warn Weeks and Covey of it." (Doc. 14 at 7.) On that ground alone, summary judgment should be denied. However, if the Court were to find an ultrahazardous activity, then this would also be a basis for liability.

### 3. Defendants' Reply

Defendants respond by spending most of their brief on the facts. Defendants assert that the parties agree that there was extensive flood damage, that the Seiferts evacuated and moved to Mississippi and did not return for six months, that Weeks and his wife were hired to inventory and clear out the shed, that the shed was "a slippery, water-soaked mess when Ms. Covey's accident reportedly occurred", that the silicone beads were "everywhere." Defendants argue that the dangerous conditions and debris were obvious. Defendants again highlight the size of the pile, and they say that Plaintiff did not see the pile because she "didn't have [her] glasses on." (Doc. 15 at 2.) Plaintiff had also slipped twice before on the property before slipping in the shed.

As to the diapers on the floor, Defendant state that Ms. Seifert testified that the flood had opened the boxes. She stated: "They were everywhere. It was – I took a shovel when I was there

one day alone, and I took a shovel and shoveled out as much as I could because I was afraid my husband would attempt to go back there with his walking cane." (Doc. 15 at 2 (citation omitted).) Ms. Seifert said there was "so much debris in there" and that she "made [herself] a walkway through there so [she] could check on the back items - - In the back of the shop, but there was no way to get all of it." (Doc. 15 at 3.)

Defendants urge that Plaintiff's argument about fault is "meaningless" because "the parties agree that the overall condition of the property was slippery and dangerous and that the silicone beads from the burst diapers were 'everywhere' and impossible to miss." (Doc. 15 at 3.)

Defendants focus on the fact that Plaintiff has done nothing to demonstrate a genuine issue of material fact that (1) Defendants had no custody of the property during the renovation, and (2) the conditions were "open and obvious." Defendants urge that Plaintiff's only argument about negligence is the alleged attempted concealment and the failure to warn, but this is immaterial because of the fact that the conditions were open and obvious.

### B.  Which Theory of Liability Applies

Where jurisdiction is founded on diversity, federal courts must apply the substantive law of the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817 (1938*); James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 69 (5th Cir. 2014) (citing *Westlake Petrochems., L.L.C. v. United Polychem., Inc.*, 688 F.3d 232, 238 n.5 (5th Cir. 2012)).  Here, there is no dispute that Louisiana law applies.

Plaintiff seeks recovery under three theories: ultrahazardous activities, strict liability, and negligence.  In short, Plaintiff is only entitled to recover under negligence.

As to the first theory, Louisiana Civil Code article 667 provides in relevant part that a "proprietor [of an estate] is answerable for damages without regard to his knowledge or his

exercise of reasonable care, if the damage is caused by an ultrahazardous activity." La. Civ. Code art. 667. However, Article 667 concludes: "An ultrahazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives." *Id.* Since Plaintiff's work in this case clearly does not qualify as either of these activities, Plaintiff cannot recover under this theory.

Nor can Plaintiff recover under strict liability. Article 2317 provides: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications." La. Civ. Code art. 2317. Article 2317.1 then states:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

La. Civ. Code art. 2317.1.

"It is well-settled that the temporary presence of a foreign substance is not, in and of itself, a defect for purposes of strict liability under La. Civ. Code art. 2317." *Holden v. Louisiana State Univ. Med. Ctr. in Shreveport*, 29,268 (La. App. 2 Cir. 2/28/97); 690 So. 2d 958, 961 (collecting cases); *Dickerson v. Winn-Dixie, Inc.*, 2001-0807 (La. App. 1 Cir. 2/27/02); 816 So.2d 315, 317 (collecting cases). "The reasoning behind this rule is that the presence of the foreign substance does not create a vice or a defect inherent in the thing itself." *Holden*, 690 So. 2d at 961; *Dickerson*, 816 So. 2d at 317 (same). "As such, the presence of a liquid on the floor such as peach or pear juice does not render the premises defective, and Article 2317 is inapplicable." *Holden*, 690 So. 2d at 961; *see also Dickerson*, 816 So. 2d at 317 ("The presence

of a substance like potting soil does not render the premises (the 'thing' for purposes of strict liability) defective, and La. C.C. art. 2317 is inapplicable.").

"Thus, this case is one of negligence under [Louisiana Civil Code article] 2315." *Holden*, 690 So. 2d at 961 (citations omitted). Article 2315 provides: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315. "The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under [Article] 2315." *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06); 923 So.2d 627, 632–33 (citing *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94); 646 So. 2d. 318, 321). Under this analysis, a plaintiff must prove five separate elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Id.* at 633 (citing *Fowler v. Roberts*, 556 So. 2d 1, 4 (La. 1989)*, reh'g granted on other grounds and original opinion reinstated as supplemented,* 556 So. 2d at 13 (La. 1990)). "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." *Id.* (citing *Mathieu*, 646 So. 2d at 326).

### C. Analysis

Defendants seek dismissal on three main grounds: (1) force majeure; (2) a lack of custody; and (3) the open/obviousness of the condition. The Court will examine each of these in turn.[2]

---

[2] The Court notes that, while Plaintiff did not address Defendants' alleged lack of custody and the obviousness of the condition per se, Plaintiff did raise factual issues in briefing that touch on all of these issues. Thus, the Court

## 1. Force Majeure

### a. Relevant Law

"The term 'force majeure' means a superior or irresistible force." *Hanks v. Entergy Corp.*, 2006-477 (La. 12/18/06); 944 So. 2d 564, 576 n. 10 (citing *Saden v. Kirby,* 94–0854, p. 8 (La.9/5/95); 660 So. 2d 423, 428). "The concept of force majeure is similar to the common law concept of 'act of God,' which has been defined as a providential occurrence or extraordinary manifestation of the forces of nature, which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence, and care, or by the use of those means, which the situation renders reasonable to employ." *Id.* at 576 n. 10 (citing *Saden,* 660 So. 2d at 428; *Southern Air Transport v. Gulf Airways,* 215 La. 366, 376, 40 So. 2d 787, 791 (1949)). "An act of God in the legal sense acts as a defense sufficient to excuse the defendant's neglect of a duty and relieve him of liability for injury." *Id.* (citing *Southern Air Transport,* 215 La. at 376, 40 So.2d at 791).

Critically, "[h]owever, when a force majeure or act of God combines or concurs with the conduct of a defendant to produce an injury, the defendant may be held liable for any damages that would not have occurred, but for its own conduct or omission." *Id.* (citing *Saden,* 660 So. 2d at 428). Thus, in *Hanks*, the Louisiana Supreme Court found, in a case involving a lightening strike and fire, that "there was a reasonable basis for the district courts conclusion that it was more probable than not Entergy's negligence caused the damage in this case." *Id.* at 582.[3]

---

rejects Defendants' attempt to obtain summary judgment on these theories when Plaintiff has demonstrated questions of fact on them, albeit inartfully.
[3] The Supreme Court explained:

> The record does support the conclusion Entergy's failure to maintain or install its arrester more probably than not caused the damage to the transformer, which, in turn, resulted in the over voltage in the electrical service to the house, which led to the fire, because, according to Smith, had the arrester been operational, the dissipated current would have been within the capacity of the arrester to ground and prevent over voltage to the transformer

### b. Application

Here, the Court finds that Defendants are not entitled to summary judgment under the doctrine of force majeure. A reasonable jury could conclude from the above evidence that the Seiferts should be assigned at least some fault for their own negligent conduct. Specifically, Mrs. Seifert admitted to not telling Weeks and Plaintiff about the condition of the barn. (L. Seifert Dep. 14:1–24, 35:22–36:6, Doc. 14-4.) She also stated that "there [wa]s no way for them to notice"; that she had "some of it shoveled outside the door to the side . . . under the bushes"; that she was "very embarrassed that that had happened"; and that she "didn't want [her husband] to see it, what had happened." (L. Seifert Dep. 14:6–19, Doc. 14-4.)

Additionally, the Court must construe the evidence about lighting in the shed in a light most favorable to Plaintiff. Specifically, Weeks testified that the lighting in the shed was inadequate ("but there no lights, so we weren't able to hook up any lights, so - - and it was dark in the afternoon, and their shop was in the shade, and the sun sets behind us" (Weeks Dep. 48:10–15, Doc. 12-4.)). This testimony reinforces the need for Mrs. Seifert to warn Plaintiff about the conditions in the shed and her negligence in failing to do so.

Thus, questions of fact prevent the Court from granting summary judgment on the issue of force majeure. Accordingly, Defendants' motion on this issue is denied.

### 2. Custody or Control

### a. Relevant Law

Defendants' next argument relates to Mrs. Seifert's alleged lack of custody over the shed. "The owner or person having custody of immovable property has a duty to keep such property in

---

*Hanks*, 944 So.2d at 582.

a reasonably safe condition. This person must discover any unreasonably dangerous condition on the premises and either correct the condition or warn potential victims of its existence." *Carter v. Bd. of Sup'rs of Louisiana State Univ.*, 459 So.2d 1263, 1265 (La. App. 1 Cir. 1984) (citations omitted). "This duty is the same under both the strict liability theory of [Article] 2317 and the negligence liability theory of [Article] 2315." *Id.* (citing *Kent v. Gulf States Utils. Co.*, 418 So. 2d 493 (La. 1982); *Farr v. Montgomery Ward and Co., Inc.*, 430 So.2d 1141 (La. App. 1 Cir. 1983)).

"Under either theory of liability, the plaintiff has the burden of proving that: (1) the property which caused the damage was in the custody of the defendant; (2) the property was defective because it had a condition that created an unreasonable risk of harm to persons on the premises; and (3) the defect in the property was a cause-in-fact of the resulting injury. In both negligence and strict liability cases, the reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing." *Id.* at 1265–66 (citing *Hunt v. City Stores, Inc.*, 387 So.2d 585 (La. 1980)); *see also Young v. City of Plaquemine*, 2002-0280 (La. App. 1 Cir. 5/10/02), 818 So.2d 898, 899 ("A plaintiff who attempts to impose liability under Civil Code article 2317 on the custodian of a defective thing must prove (1) the thing had a vice or defect; (2) the defect presented an unreasonable risk of harm to others; (3) the thing was in defendant's custody; and (4) damage was caused by the defect.").

Additionally, before the 1996 revision, the "difference in proof between these two theories of liability" was that "under [Article] 2315, the plaintiff [had to] show that the owner or custodian either knew or should have known of the risk, whereas under [Article] 2317, the plaintiff [wa]s relieved of proving scienter on the part of the defendant." *Id.* at 1265 (citing *Kent, supra*). However, under the current articles governing strict liability, a plaintiff must show that

the "owner or custodian of a thing . . . knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage". *See* La. Civ. Code art. 2317.1.

Defendant relies on the principle that, "Generally, an owner of a building under construction or renovation does not have custody for purposes of liability under [Article] 2317." *Young*, 818 So. 2d at 899; *see also Sasser v. Wintz*, 2011-2022 (La. App. 1 Cir. 9/4/12), 102 So.3d 842, 846 ("the owner of a building under construction or renovation generally does not have custody for purposes of liability based on the foregoing civil code articles [(i.e., Articles 2317, 2317.1, and 2322)].").  "An exception to that rule occurs when the owner exercises operational control over the contractor's methods of operation or gives express or implied authorization to unsafe practices." *Young*, 818 So. 2d at 899 (citing *Williams v. Gervais F. Favrot Co.*, 499 So. 2d 623 (La. App. 4 Cir. 1986)).

### b.  Application

In short, the Court rejects Defendant's arguments.  Even if the Court were to apply this theory,[4] there are still questions of fact precluding summary judgment.

The key here is whether the Seiferts had control of the shed. *Young*, 818 So. 2d at 899. "The determination of who has the custody or garde of the thing is fact driven. *Id.* (citing *Doughty v. Insured Lloyds Ins. Co.*, 576 So. 2d 461 (La. 1991)). "In considering the issue of custody or garde, our courts consider the following general principles: (1) whether the person bears such a relationship as to have the right of direction and control over the thing; and (2) what, if any, kind of benefit the person derives from the thing." (citing *Doughty*, 576 So.2d at 464; *King v. Louviere*, 543 So.2d 1327 (La. 1989); *Loescher v. Parr*, 324 So. 2d 441 (La. 1975)).

---

[4] The Court notes that both cases Defendants rely upon (*Young* and *Sasser*) apply this principle to defective conditions or vices in premises under the strict liability articles. *See, Young, Carter, supra.*  Conversely, this case involves slippery substance *on* the premises and the negligence article.  In fact, this is exactly what Defendants argued in rejecting Plaintiff's strict liability theory.

Here, there are questions of fact on Mrs. Seifert's custody or control. Weeks was asked at his deposition if Linda Seifert was "there at any time when [he was] doing [the cleanup]?", and he responded:

> Very, very rarely; they were there to deliver supplies and so forth and to bark at me a little bit and then – you know, because that's what moms do best, and she would sometimes deliver supplies, pay me back, reimburse me for supplies that I got, and she would go out and play with the – not play, but work in the garden and recover plants, trying to get her plants back, and she wouldn't not so much go in and work because she's, kind of, frail.

(Weeks Dep. 36: 14–24, Doc. 12-4.) And, as mentioned above, though not malicious, Mrs. Seifert did not tell Defendant about the conditions in the shed which were hard to see and which she admitted could not be noticed. *See, supra.*

Thus, the Court finds that, construing this testimony in a light most favorable to Plaintiff and drawing reasonable inferences in her favor, there is enough to establish a question of fact on the Defendants' custody or control over the shed. A reasonable jury could conclude that she authorized the unsafe practices. Accordingly, summary judgment on this issue is denied.

### 3. Open and Obvious

#### a. Relevant Law

Lastly, Defendants contend that the harm posed by the exploded diapers was open and obvious. As a result, Defendants maintain that Plaintiff should be precluded from recovery.

This Court has guidance on this issue from the Louisiana Supreme Court's recent decision of *Broussard v. State, Office of State Buildings*, 2012-1238 (La. 4/5/13); 113 So. 3d 175. There, the Supreme Court reversed the appellate court and held that there was "a reasonable basis . . . to support the jury's factual determination that a one and one-half to three inch offset between the floor of the elevator and the floor of [an office] lobby presented an unreasonable risk of harm." *Id.* at 193–94. The Supreme Court further found that there was a

reasonable factual basis for the jury's finding that "the elevator's defective condition was not an open and obvious hazard, as the defect was not readily apparent to all who encountered it." *Id.* at 194.

In reaching this result, the Supreme Court explained that "the question of whether a defect presents an unreasonable risk of harm is 'a disputed issue of mixed fact and law or policy that is peculiarly a question for the jury or trier of the facts.' " *Id.* at 183 (quoting *Reed v. Wal– Mart Stores, Inc.*, 97–1174 (La. 3/4/98), 708 So. 2d 362, 364). "As a mixed question of law and fact, it is the fact-finder's role—either the jury or the court in a bench trial—to determine whether a defect is unreasonably dangerous." *Id.* "Thus, whether a defect presents an unreasonable risk of harm is 'a matter wed to the facts' and must be determined in light of facts and circumstances of each particular case." *Id.* (quoting *Dupree v. City of New Orleans*, 99–3651 (La. 8/31/00); 765 So. 2d 1002, 1012; *Reed*, 708 So. 2d at 364).

The Supreme Court then laid out the appropriate standard for determining whether a condition presents an unreasonable risk of harm:

> To aid the trier-of-fact in making this unscientific, factual determination, this Court has adopted a risk-utility balancing test, wherein the fact-finder must balance the gravity and risk of harm against individual societal rights and obligations, the social utility of the thing, and the cost and feasibility of repair. Specifically, we have synthesized this risk-utility balancing test to a consideration of four pertinent factors: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature.

*Broussard*, 113 So. 3d at 184 (citations omitted).

The Court then turned to the proper way of analyzing the question of whether the condition is "open and obvious":

> [W]e find the analytic framework for evaluating an unreasonable risk of harm is properly classified as a determination of whether a defendant breached a duty owed,

19

rather than a determination of whether a duty is owed *ab initio*. It is axiomatic that the issue of whether a duty is owed is a question of law, and the issue of whether a defendant has breached a duty owed is a question of fact. The judge decides the former, and the fact-finder—judge or jury—decides the latter. In the usual case where the duty owed depends upon the circumstances of the particular case, analysis of the defendant's conduct should be done in terms of 'no liability' or 'no breach of duty.' Because the determination of whether a defect is unreasonably dangerous necessarily involves a myriad of factual considerations, varying from case to case, the cost-benefit analysis employed by the fact-finder in making this determination is more properly associated with the breach, rather than the duty, element of our duty-risk analysis. Thus, while a defendant only has a duty to protect against unreasonable risks that are not obvious or apparent, the fact-finder, employing a risk-utility balancing test, determines which risks are unreasonable and whether those risks pose an open and obvious hazard. In other words, the fact-finder determines whether defendant has breached a duty to keep its property in a reasonably safe condition by failing to discover, obviate, or warn of a defect that presents an unreasonable risk of harm.

*Id.* at 185 (citations and quotations omitted).

Equally critical, for a condition to be "open and obvious," "the hazard should be one that is open and obvious to all, *i.e.,* everyone who may potentially encounter it." *Id.* at 184. "The open and obvious inquiry thus focuses on the global knowledge of everyone who encounters the defective thing or dangerous condition, not the victim's actual or potentially ascertainable knowledge." *Id.* at 188. As the *Broussard* court further explained:

Simply put, we would undermine our comparative fault principles if we allowed the fact-finder to characterize a risk as open and obvious based solely on the plaintiff's awareness of that risk. The plaintiff's knowledge or awareness of the risk created by the defendant's conduct should not operate as a total bar to recovery in a case where the defendant would otherwise be liable to the plaintiff. Instead, comparative fault principles should apply, and the plaintiff's "awareness of the danger" is but one factor to consider when assigning fault to all responsible parties under La. Civ. Code art. 2323

*Id.* at 188–89 (citations omitted). Thus, in *Broussard*, the Supreme Court found that "a fact-finder could reasonably infer the defect, while apparent to [plaintiff], was not open and obvious to all who encountered it." *Broussard*, 113 So. 3d at 190.

It must be emphasized that *Broussard* is not a per se bar to summary judgment in open and obvious cases. *See Allen v. Lockwood*, 2014-1724 (La. 2/13/15); 156 So. 3d 650, 652–653 (per curiam) ("Our comments under this discussion clearly pertained to cases that were tried either by judge or jury. Any reading of *Broussard* interpreting it as a limit on summary judgment practice involving issues of unreasonable risk of harm is a misinterpretation of the *Broussard* case."). "*Broussard* should not be construed as precluding summary judgment when no legal duty is owed because the condition encountered is obvious and apparent to all and not unreasonably dangerous." *Id.* at 653 (citing *Bufkin v. Felipe's Louisiana, LLC*, 2014–0288 (La. 10/15/14); 171 So.3d 851, 859 n. 3). Louisiana "jurisprudence does not preclude the granting of a motion for summary judgment in cases where the plaintiff is unable to produce factual support for his or her claim that a complained-of condition or things is unreasonably dangerous." *Id.* (citing *Bufkin*, 171 So. 3d at 859 (Guidry, J., concurring)).

Thus, in *Allen*, the "narrow issue presented . . . [was] whether defendants are entitled to summary judgment when plaintiff is unable to produce any evidence supporting her contention their parking lot was unreasonably dangerous." *Id.* at 651. The Court found that, after the defendants produced evidence showing that there was no unreasonable risk of harm, "Plaintiff then failed to produce *any* evidence to rebut their evidence or demonstrate how the alleged defects caused the accident. Moreover, she could not even say what the church defendants did to cause the accident." *Id.* at 653. Thus, there was no genuine issue of material fact, and defendants were entitled to summary judgment. *Allen*, 156 So. 3d at 653. [5]

---

[5] Doctrine is conflicting on the continued effect of *Broussard* in the summary judgment context. *Compare*, 1-9 Frank L. Maraist & Thomas C. Galligan, Jr., *Louisiana Tort Law* § 9.12 (2017) ("Following on *Bufkin*, the [Louisiana Supreme] Court more expressly declared the irrelevance of *Broussard* to summary judgment practice in 2015 in *Allen v. Lockwood*", *with* 1 Russ Herman & Joseph E. Cain, *Louisiana Practice Series: Louisiana Personal Injury* § 4:184 (2018) ("Case law now clearly mandates that the analysis of whether an open and obvious defect is an unreasonable risk of harm is properly a determination of *fact*, that takes into consideration the victim's own comparative fault, among other factors; and, accordingly, is not proper for summary judgment, [*Currie v. Scottsdale*

## b. Application

Here, looking at the "unscientific, factual determination" the trier-of-fact must make, *Broussard*, 113 So. 3d at 184, a reasonable jury could find in the Plaintiff's favor. The Seifert's workshop—a shed on private property—has little social utility. As to balancing the "cost and feasibility of repair," the cost of correcting the problem was not "inordinate or cost-prohibitive," *Broussard*, 113 So. 3d at 192, as evidenced by the very low rate Weeks charged for the cleanup work. Finally, a reasonable jury could find that the plaintiff's activity—providing relief efforts after the great flood at a low cost—has an extraordinarily high social value and is not inherently dangerous.

As to the likelihood and magnitude of the harm, including the obviousness of the condition, the Court finds, based on *Broussard* and subsequent case law, that genuine issues of material fact preclude summary judgment. Specifically, construing the facts in a light most favorable to Plaintiff and drawing reasonable inferences in her favor, a reasonable juror could conclude from Mrs. Seifert's testimony that the danger from the diapers was not open and obvious. Again, Mrs. Seifert testified:

> Q: Now, did you tell them anything about there being this diaper, gelatinous, slippery substance on the floor before they went in?
>
> A: I believe I told my son, but I'm not quite sure. *I mean there is no way for them to notice.* I mean I had it - - some of it shoveled outside the door to the side. . . under the bushes, and I was very embarrassed that that had happened. . . . I didn't want my husband - - no, him anywhere near there, and I didn't want him to see it, what happened. . . . But - -and I tell you the truth, I - - (Witness shakes head.) - - I don't - - *I don't remember telling him. I really don't remember telling him.* I remember telling him to be very careful - -

---

*Indem. Co.*, 123 So. 3d 742 (La. App. 1 Cir. 2013) (citing *Broussard, supra*)], *unless* plaintiff has failed to come forward with *any* evidence that the condition is unreasonably dangerous, in which case summary judgment for the defendant is appropriate. [*Allen, Bufkin, supra*].").

(L. Seifert Dep. 14:1–24, Doc. 14-4 (emphasis added).)  She further said:

> Q:    I just want to be clear about this - - this mess with the diapers.  You didn't mention anything at all to Angela about that particular problem, the silica - -
>
> A:    I know I didn't, because that's why I was back there with the shovel, because I was so embarrassed about that happening . . . and didn't want anybody to see that or have any questions about my mother, you know.

(L. Seifert Dep. 35:22–36:6, Doc. 14-4.)

Moreover, the Court rejects Defendants' argument that the condition of the shed was even more open and obvious because Plaintiff had been in the shed previously and failed to wear her glasses.  *Broussard* specifically found that the "the hazard should be one that is open and obvious to all, *i.e.,* everyone who may potentially encounter it." *Broussard*, 113 So. 3d at 184. Again, "[t]he open and obvious inquiry thus focuses on the global knowledge of everyone who encounters the defective thing or dangerous condition, not the victim's actual or potentially ascertainable knowledge." *Id.* at 188.  Thus, Plaintiff's prior visit into the shed or lack of glasses is not a factor in the open and obvious analysis.

The Court recognizes, as Defendants argue, that the pile of exploded diapers was large and the mess great.  But, Mrs. Seifert's testimony shows that this is a question of comparative fault, not a matter of barring Plaintiff's recovery on the open and obvious theory.  Unlike *Allen*, this is a case where there is some summary judgment evidence which at least creates a question of fact on this issue.  For all these reasons, summary judgment is inappropriate.

**IV.     Conclusion**

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 12) filed by Defendants Phillip V. Seifert, Linda K. Seifert, and Allstate Insurance Company is **DENIED**; and

**IT IS FURTHER ORDERED** that the parties shall have until 12:00 p.m. on Monday, January 28, 2019, to submit new proposed findings of fact and conclusions of law, if they should so choose.

Signed in Baton Rouge, Louisiana, on January 23, 2019.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**